UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROJECT SENTINEL, | No. 1:19-cv-00708-DAD-EPG |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT BE GRANTED IN PART AND DENIED IN PART |
| v. | |
| JEANETTE KOMAR and SARAH KOMAR, | (ECF No. 68) |
| Defendants. | FOURTEEN-DAY DEADLINE |

Plaintiff Project Sentinel ("Plaintiff") commenced this action on May 20, 2019, by filing a complaint alleging Defendants Jeanette Komar, Sarah Komar (with Jeanette Komar, "Defendants") and Meyer Komar[1] violated the Fair Housing Act ("FHA"); the Civil Rights Act of 1866; and various California state laws by engaging in discriminatory housing practices, including the Fair Employment and Housing Act ("FEHA"). (ECF No. 1).

On December 24, 2020, Plaintiff filed a motion for a default judgment against Defendants. (ECF No. 68). Defendants have not filed any appearance in this case and did not file any response to the motion. On February 5, 2021, the Court held a telephonic hearing on the motion. Counsel Liza Cristol-Deman appeared for Plaintiff. Defendants did not appear. The motion for a default judgment is now pending before the Court. For the following reasons, the Court recommends

---

[1] On January 4, 2021, Defendant Meyer Komar was dismissed from this action without prejudice after Plaintiff located an obituary for him. (ECF No. 76).

1

1     granting the motion in part, and denying it in part.

2 **I.        BACKGROUND AND EVIDENCE IN SUPPORT OF DEFAULT JUDGMENT**

3        **A.       Summary of Complaint**

4         Plaintiff's complaint (ECF No. 1) alleges as follows:

5                1.     Parties

6         Plaintiff is a non-profit organization with the organizational mission "to develop and

7 promote fairness and equality of housing for all persons and to advocate peaceful resolutions for

8 community welfare and harmony." (*Id.* at 2). It provides community education, conducts training,

9 and provides fair housing counseling. (*Id.*).

10         Meyer and Jeanette Komar, at the time Plaintiff filed the complaint, owned and managed a

11 three-unit residential rental property at 2200 San Lucas Court, Modesto, California (the

12 "Property"). Jeanette and Meyer Komar's daughter, Sarah Komar, also managed the Property.

13         Since this action began, it appears that Meyer Komar has died. (*See* ECF No. 76). In

14 addition, Plaintiff informs the Court that the Property has been sold but Jeanette Komar owns

15 another rental property. (ECF No. 78).

16                2.     Investigation

17         On March 31, 2017, a neighbor of the Property contacted Plaintiff about Defendants'

18 apparent racial discrimination in selecting renters. The neighbor reported that one of her

19 acquaintances called in response to an advertised vacancy at the Property and spoke with an

20 unidentified woman. The unidentified woman told the acquaintance, " 'You sound Black, I don't

21 rent to black people,' or words to that effect. The [neighbor] also said the landlords at the subject

22 property called someone the 'N' word in public." (ECF No. 1 at 3).

23         Plaintiff investigated these claims. First, Plaintiff confirmed the Property was available for

24 rent and noted the phone number on the for-rent sign. Second, Plaintiff had "testers" call the

25 listed number.

26         The first tester was "a Black woman with a racially-identifiable voice" and used the name

27 "Lakisha Robinson." (*Id.* at 3). This tester left a voicemail with her name and contact information

28 and requested a return call about the unit. She did not receive a return call. The second tester was

"a white woman with a racially identifiable voice" and used the name "Allison Sullivan." (*Id.*).
This tester left a voicemail two days after the first tester. She received a call from a woman who
identified herself as "Sarah" five minutes after leaving the voicemail. Plaintiff alleges this
"Sarah" was Defendant Sarah Komar. Sarah Komar provided various instructions about the
application process. Thirty minutes after Sarah Komar returned "Allison Sullivan's" call,
"Lakisha Robinson" called the listed phone number again and left another voicemail. "Lakisha
Robinson" did not receive a response.

Plaintiff repeated this process with two more testers—a black woman who used the name
"Aisha Washington" and "a white woman with a racially-identifiable voice" who used the name
"Meredith O'Brien." (*Id.* at 4). There were similar results: Sarah Komar called "Meredith
O'Brien" back and gave her information about the property. No one returned "Aisha
Washington's" call. (*Id.*). At one point, "Meredith O'Brien" asked Sarah Komar on the phone
whether she was the owner. "Sarah Komar responded, 'I am the owner, there is no property
management,' or words to that effect." (*Id.* at 5).

3.   Standing Allegations

Plaintiff alleges that Defendants engage in a pattern or practice of racial discrimination,
preventing black home-seekers from residing at the Property.

Plaintiff diverted its resources as a result of this discrimination. Instead of engaging in its
ordinary work, Plaintiff identified and investigated Defendants' housing practices. It conducted
targeted education and outreach efforts to combat the effects of Defendants' acts. Plaintiff
devoted significant staff time to the project, provided fair-housing information at a community
event that served many of Modesto's black residents, and distributed educational literature to
redress the impact of Defendants' discrimination.

Plaintiff's mission was also frustrated. Plaintiff will need to invest resources into
monitoring Defendants' rental properties and undertaking education and outreach efforts. It will
also conduct future monitoring, testing, and training.

4.   Claims

Plaintiff brings federal law claims under the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*,

3

1    and Civil Rights Act of 1866, 42 U.S.C. § 1981. Plaintiff also brings statutory state-law claims

2    under the California Fair Employment and Housing Act ("FEHA"), California Civil Code section

3    1714 (negligence), and California Business and Professional Code section 17200 et seq. (unfair

4    business practices).

5              **B.      Service and Default of Defendants**

6                        1.    Service

7         Plaintiff's process server personally served Meyer Komar at 1523 Gary Lane, Modesto,

8    California on June 24, 2019. (ECF No. 4). Concurrently, the process server also left summonses

9    for Defendants Jeanette and Sarah Komar with Meyer Komar. (ECF Nos. 5 & 6). The deed for

10   1523 Gary Lane indicates it was owned by Meyer and Jeanette Komar, "husband and wife as joint

11   tenants." (ECF No. 71-4 at 3). The process server's office proceeded to mail copies of the same

12   documents to Sarah and Jeanette Komar at 1523 Gary Lane after serving Meyer Komar. (ECF

13   No. 82-6).

14        Accurint records list Sarah Komar's address at the time of service of process as 3616

15   Shady Valley Court, Modesto, California. (ECF No. 82-7 at 2). The search tool Accurint showed

16   that Sarah Komar lived at Shady Valley Court at the relevant time. (ECF No. 82-7 at 2).

17        Sarah Komar appears to be related to Meyer and Jeanette. Along with sharing the same

18   last name, Meyer and Sarah Komar both had licenses with the Department of Insurance registered

19   at 3616 Shady Valley Court, Modesto, California. (ECF No. 71-5 at 2, 5). Plaintiff's Accurint

20   search records list "Meyer Komar" and "Jeanette M. Komar" as "possible relatives" of Sarah.

21   (ECF No. 82-3 at 4). According to Plaintiff's counsel, one of Plaintiff's former staff attorneys

22   informed her that Sarah was Meyer and Jeanette Komar's adult daughter. (ECF No. 82-1 at 2).

23   Counsel does not recall how the staff attorney learned that information. (*Id.*).

24        A process server attempted to serve Sarah Komar at the 3616 Shady Valley Court address

25   five times but was unsuccessful. (ECF No. 82-5) (process server's report). Only after these

26   attempts, the last of which occurred on June 6, 2019, did the process server serve Meyer Komar

27   with summons for Sarah Komar at 1523 Gary Lane. In September 2019, Plaintiff's counsel asked

28   a process server, Gary Ermoian, to serve Sarah Komar at a separate address after finding the

address on Accurint. (ECF No. 82-1 at 3). According to counsel's declaration, no one answered the door at that location the two times he attempted to serve her there. (*Id.*). Ermoian's declaration does not mention going to that location. (ECF No. 82-6).

On August 19, 2019, Meyer Komar informed Plaintiff that Sarah Komar had "moved out of the area" but declined to provide a new address. (ECF No. 82-1 at 3).[2]

### 2.   Defendants' Participation in This Lawsuit

Meyer Komar participated in the lawsuit several times. (ECF Nos. 8 (answer); 13 (response to order to show cause for failure to appear at scheduling conference); 29 (motion to dismiss)). Several times, he indicated that he represented his family members. (ECF Nos. 13 ("If project Sentin[e]l plans to move their case against me to trial I will represent and defend my family at that time.") & 29 (immediately before signature in motion to dismiss, "Submitted by Meyer Komar (defendant for himself & Jeanette and Sarah Komar)"). In addition, according to counsel's declaration, Meyer Komar sent counsel an email stating "I will represent the Komar family exclusively." (ECF No. 71 at 6-7).

Although she has never answered the complaint or otherwise formally appeared, Defendant Jeanette Komar has filed numerous documents with the Court. On February 27, 2020, Defendant Jeanette Komar filed a letter with the Court, indicating that Meyer Komar was in ill health. (ECF No. 39). The letter attached an email Jeanette sent to counsel, stating that neither she nor Sarah waived service of process. On April 8, 2020, Jeanette filed a second letter, providing additional information concerning Meyer Komar's ill health. (ECF No. 41). On July 14, 2020, Jeanette filed another letter, which mostly discussed discovery issues and Meyer's continued ill health. (ECF No. 52). According to counsel's declaration, Jeanette also communicated with counsel over the phone, through voicemail messages, via email, and via physical mail. (ECF No. 71 at 9-12).

Sarah Komar has not filed any documents. Counsel states that she has not received any communication from Sarah. (ECF No. 71 at 12).

---

[2] The Court subsequently granted Plaintiff's motion to compel Meyer Komar to, *inter alia*, inform Plaintiff of Sarah Komar's address. (ECF No. 51 at 9-10). It appears that Meyer Komar subsequently died; he did not comply with the order before his apparent death. (*See* ECF No. 60).

3.      Entry of Default and Motion for Default Judgment

On September 20, 2019, Plaintiff requested an entry of default as to Defendants. (ECF No. 14). The clerk entered the default on September 24, 2019. (ECF No. 16). On December 24, 2020, Plaintiff filed the motion for default judgment, which is now before the Court. (ECF No. 68).

On February 4, 2021, Plaintiff filed an additional declaration concerning an apparent change in the ownership of the property that is the subject of this lawsuit. (ECF No. 78). On February 5, 2021, the Court held a telephonic hearing on the motion. Counsel Liza Cristol-Deman appeared for Plaintiff. Defendants did not appear.

The Court requested additional information concerning service on Sarah Komar (ECF No. 81) and Plaintiff's damages' calculations (ECF No. 83). Plaintiff filed the additional information concerning service on Sarah Komar on March 15, 2021, (ECF No. 82) and Plaintiff's damages' calculations on March 30, 2021, (ECF No. 84).

**C.     Summary of Motion for Default Judgment**

Plaintiff argues that Defendants have defaulted by failing to answer the complaint or meaningfully participate in the action. Plaintiff argues the *Eitel* factors favor granting a default judgment and that Plaintiff is entitled to compensatory damages and attorneys' fees. Defendants have not filed an opposition. The Court highlights a few aspects of the motion and its related filings.

1.      Standing

Plaintiff argues that it has standing to because its resources were drained and its mission was frustrated. (ECF No. 69 at 17-18). Plaintiff also filed a declaration by its executive director, Ann Marquat, which appears to concern standing. (ECF No. 70).

Plaintiff is a fair-housing organization. Plaintiff conducts "investigations and research regarding housing discrimination," provides "more than 50 housing-related programs, including educational seminars . . . on fair housing," and "conducts regular trainings for real estate professionals and rental housing owners regarding fair housing laws[.]" (*Id.* at 1-3). It also conducts testing, in cases such as these. (*Id.* at 3). It must recruit, train and pay testers, requiring a significant amount of staff time, including conducting four trainings per year. (*Id.* at 4).

In order to conduct this case, Plaintiff had to expend resources documenting the complainant's story; investigating Defendants' conduct; filing a complaint with the Department of Housing and Urban Development; and pursuing that complaint with the California Department of Fair Employment and Housing, to which the Department of Housing and Urban Development transferred the complaint. This involved attorneys' and staff members' time. (*Id.* at 6-10). Staff's doing so constituted a diversion of resources to counteract Defendants' discrimination:

> Defendants' discriminatory housing practices caused Project Sentinel to focus on investigating their rentals and counteracting the discrimination uncovered. If Project Sentinel had not been forced to divert its resources to investigating defendants' discriminatory housing practices, Project Sentinel could have invested those same resources into its affirmative, proactive programs designed to promote and protect equal opportunities in housing. Project Sentinel also diverted its resources to activities to counteract the effects of defendants' discrimination – resources which could have been allocated to other programs if defendants had not engaged in discrimination. Every discriminatory housing practice reported and investigated means less time to counsel their complainants and investigate other matters, engage in community education, and support the various other programs administered by Project Sentinel.

(*Id.* at 9).

Going forward, Plaintiff intends to continue to monitor Defendants' fair-housing practices by conducting two tests per year over the next three years and monitoring Defendants' advertisements and signs. (*Id.* at 13).

Marquat also declares that Defendants' actions had a broader effect on the community:

> 53. Defendants' discrimination here may have had an effect far beyond the incidents of discrimination that are the basis of this lawsuit. On a broader community level, Project Sentinel needs to take action in the future to increase awareness of housing discrimination based on race and the consequences of that discrimination. The discrimination by the Komars should serve as a wake-up call that discrimination based on race still happens. And that it happens here in California. Discrimination that goes unchecked sends a message to landlords that they can act with impunity. It also sends a message to renters that they have no rights or that their rights are meaningless. In short, Project Sentinel's mission remains critical. The agency has to work hard to ensure that the community is aware of the housing discrimination laws and the ways in which they can be enforced.
>
> 54. Project Sentinel will target its outreach and training efforts to segments of the community affected by the housing discrimination uncovered in this case. Such

trainings will include one for the West Modesto Community Center regarding housing discrimination based on race. In addition, Project Sentinel seeks to create approximately 1000 flyers regarding housing discrimination based on race and plans to distribute them in the same census tract where the defendants' rental premises is located.

55. These community outreach and training efforts will require approximately 8 hours of staff time, plus expenses for mailing and copying.

(*Id.* at 14).

### 2.   Summary of Plaintiff's Arguments

Plaintiff argues that it is entitled to a default judgment because it has already received a clerk's entry of default, (ECF No. 16), and the *Eitel* factors, which the Ninth Circuit uses to consider motions for default judgment, favor granting a default judgment. (ECF No. 69 at 9-17).

Plaintiff argues that it is entitled to damages because it diverted its resources and its mission was frustrated by Defendants' conduct. (*Id.* at 17-18). It further seeks injunctive relief and attorneys' fees and costs. (*Id.* at 18-23).

Defendants have not responded to the motion or any of Plaintiff's additional filings.

## II.   LEGAL STANDARDS FOR DEFAULT JUDGMENT

Federal Rule of Civil Procedure 55(b) permits a court to enter default judgment following a defendant's default. *Boards of Trustees v. Energy Management*, 2012 WL 1657523 at *1 (N.D. Cal. 2012) (citation omitted). Rule 55 specifically provides that:

(b) Entering a Default Judgment
(1)  By the Clerk. If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person.
(2)  By the Court. In all other cases, the party must apply to the court for a default judgement. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared personally or by a representative, that person or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to:
(A)  Conduct an accounting;
(B)  Determine the amount of damages;

8

(C)   Establish the truth of any allegation by evidence; or

(D)   Investigate any other matter.

Whether to enter a default judgment lies within the court's discretion. *Draper v. Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986). The Ninth Circuit has enumerated the following factors (collectively, the *Eitel* factors) that a court may consider in determining whether to grant default judgment: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decision on the merits. *See Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

As stated above, "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *TeleVideo Sys.*, 826 F.2d at 917–18 (9th Cir. 1987). Therefore, the plaintiff is required to provide proof of all damages sought in the complaint.

In addition, before awarding a default judgment against a defendant, the court must determine the adequacy of service of process, as well as the court's jurisdiction over the subject matter and the parties. *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) ("When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties."); *Kaldawi v. Kuwait*, 709 F. App'x 452, 453 (9th Cir. 2017) ("When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties."); *cf. S.E.C. v. Internet Sols. for Bus. Inc.*, 509 F.3d 1161, 1165 (9th Cir. 2007) ("We review de novo whether default judgment is void because of lack of personal jurisdiction due to insufficient service of process.").

1   **III.    ANALYSIS**

2          **A.    Plaintiff's Standing**

3                 1.    <u>Legal Standards</u>

4          Courts "have an independent obligation to determine whether subject-matter jurisdiction

5   exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500,

6   514 (2006). Courts lack subject-matter jurisdiction over suits brought by plaintiffs without

7   standing. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). There are three

8   constitutional requirements for standing:

9          First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally

10         protected interest which is (a) concrete and particularized, and (b) actual or
           imminent. Second, there must be a causal connection between the injury and the

11         conduct complained of. Third, it must be likely, as opposed to merely speculative,
           that the injury will be redressed by a favorable decision.

12

13  *Walker v. City of Lakewood*, 272 F.3d 1114, 1123 (9th Cir. 2001) (quoting *Lujan v. Defenders of*

14  *Wildlife*, 504 U.S. 555, 560-61 (1992)) (alterations omitted).

15         There are no additional requirements for standing under the Fair Housing Act: "The sole

16  requirement for standing to sue under the FHA is the Article III minima of injury in fact: that the

17  plaintiff allege that as a result of the defendant's actions he has suffered a distinct and palpable

18  injury." *Walker v. City of Lakewood*, 272 F.3d 1114, 1123 (9th Cir. 2001) (quoting *Havens Realty*

19  *Corp. v. Coleman*, 455 U.S. 363, 372 (1982)) (alterations omitted).

20         An organization may suffer an injury in fact for standing purposes when it suffers a

21  diversion of its resources and a frustration of its mission. *Havens Realty Corp. v. Coleman*, 455

22  U.S. 363, 379 (1982); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002).

23  "Organizations divert resources when they alter their resource allocation to combat the challenged

24  practices, but not when they go about their business as usual." *Friends of the Earth v. Sanderson*

25  *Farms, Inc.*, --- F.3d ----, 2021 WL 1205023, at *2 (9th Cir. Mar. 31, 2021).

26         The United States Supreme Court addressed organizational standing in a similar situation

27  *Havens Realty*. There, plaintiff HOME was a fair housing non-profit organization "whose

28  purpose was to make equal opportunity in housing a reality in" its local area. 455 U.S. at 368. It

operated a housing counseling service and investigated complaints concerning housing discrimination. *Id.* HOME alleged that it sent two testers to determine whether an apartment complex was violating housing discrimination laws, that the white tester was told apartments were available, and that the black tester was told otherwise. HOME alleged the defendant's racial-steering practices frustrated "its efforts to assist equal access to housing through counseling and other referral services" and that "HOME has had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id.* at 379. These allegations stated an injury in fact:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.

*Id.*

The Ninth Circuit conducted a detailed analysis of *Havens* standing in *Combs.* There, a fair-housing organization sued an apartment-complex owner under the FHA, the Civil Rights Act of 1866, and California state laws for illegal housing discrimination on the basis of race. *Id.* at 902.

> Among its many activities to further its mission of promoting equal housing opportunities, Fair Housing investigates allegations of discrimination, conducts tests of housing facilities to determine whether equal opportunity in housing is provided, takes such steps as it deems necessary to assure equal opportunity in housing and to counteract and eliminate unlawful discriminatory housing practices, and provides outreach and education to the community regarding fair housing.

*Id.* The district court found that:

> one of Fair Housing's activities in combating illegal housing discrimination is to provide outreach and education to the community regarding fair housing. Fair Housing alleges that, as a result of defendant's discriminatory practices, it has suffered injury to its ability to carry out its purposes and economic losses in staff pay, in funds expended in support of volunteer services, and in the inability to undertake other efforts to end unlawful housing practices. Thus, fairly construed, Fair Housing complains that defendant's discrimination against African Americans has caused it to suffer injury to its ability to provide outreach and

1        education (i.e., counseling).

2 *Id.* at 905 (quotation marks, citations and alterations omitted).

3        The Ninth Circuit held that, with respect to diversion of resources, "an organization could

4 have standing if it had proven a drain on its resources resulting from counteracting the effects of

5 the defendant's actions." *Id*. at 904 (quoting *La. ACORN Fair Hous. v. LeBlanc*, 298, 305 (5th

6 Cir. 2000)). Because the plaintiff "showed a drain on its resources from both a diversion of its

7 resources and frustration of its mission," it had direct standing to sue. *Id.* at 905.

8        Organizations may also have standing under FEHA using the same analysis. In *Sisemore*

9 *v. Master Financial, Inc.*, 151 Cal. App. 4th 1386, 1424-26 (2007), the California Court of

10 Appeals looked to federal law and determined that Plaintiff (which was a plaintiff in that case,

11 too) had standing to bring its FEHA claims under *Havens Realty*. There, because Plaintiff

12 "alleged that it has been required to divert scarce resources to address Master Financial's alleged

13 wrongful conduct, we conclude that Project Sentinel is a 'person aggrieved' under section

14 12989.1 and has standing to assert a FEHA claim." *Id.* at 1426. Citing *Sisemore*, the Central

15 District of California found a fair-housing organization had standing to bring a FEHA claim in

16 federal court. *See Intervention911 v. City of Palm Springs*, 2014 WL 12853165, at *15 n.117

17 (C.D. Cal. July 7, 2014) ("As with its federal claims, Intervention has standing to bring a claim as

18 an 'aggrieved person' under Government Code § 12989.1.").

19                 2.     Application to Plaintiff

20        Plaintiff contends it has suffered diversion-of-resources and frustration-of-mission

21 damages. (ECF No. 70-2 at 9-13) (in Marquat declaration, sections entitled "Damages for

22 Diversion of Resources" and "Frustration of Mission Damages").

23        Marquat avers Plaintiff conducts investigations, provides housing-related programs and

24 educational seminars, conducts trainings, and tests landlords' fair-housing practices. These

25 practices require a significant amount of staff time. (ECF No. 70 at 1-4). Plaintiff diverted its

26 resources away from some of those other missions to investigate and combat Defendants'

27 conduct. Specifically, Marquat declares that:

28

> Project Sentinel suffered damages for diversion of resources caused by responding to the complaint of discrimination. The complaint required Project Sentinel to take its focus and resources away from its educational programs, counseling, and other programs and activities, and instead direct its resources to the investigation of defendants' housing practices.

(ECF No. 70 at 9).

Plaintiff has produced evidence that instead of working on its educational programs, counseling, and various other activities, it investigated defendants' housing practices. For instance, it has filed timesheets showing that its staff was diverted, (ECF No. 70-3), and summaries of other expenditures Plaintiff encountered, such as the costs of testing and out-of-pocket expenses, (ECF Nos. 70 at 9-12 (discussing testing and investigation costs for this case); 70-2 (showing summary of damages, including out-of-pocket expenses)). To counteract Defendants' allegedly illegal conduct, Plaintiff also conducted outreach and community education efforts. (ECF Nos. 70 at 11 (discussing staff attorney Jennifer Reynolds' outreach and education efforts); 70-3 at 7 (Reynolds' time sheet)). These were diversions of Plaintiff's resources.

In fact, Plaintiff's diversion is nearly identical to Fair Housing of Marin's in *Combs*. Both organizations seek to reduce illegal housing discrimination. Both investigated their respective defendants' illegal activities after receiving complaints. *Combs*, 285 F.3d at 902 ("air Housing received complaints that Combs was racially discriminating against black tenants and black potential tenants. In response, Fair Housing conducted two sets of controlled tests where a black tester was shown a unit at Waters Edge followed by a white tester."); (ECF No. 1 at 3-5) (allegations in complaint concerning tip Plaintiff received and subsequent testing). Both provided education and outreach to the affected communities to counteract the discrimination, and expended staff time and resources to do so. *Combs* at 905 (finding organization's "resources were diverted to investigating and other efforts to counteract Combs' discrimination");[3] (ECF No. 70 at 9-12) (discussing testing and investigating costs). Accordingly, just as Fair Housing of Marin had standing to pursue its Fair Housing Act, Civil Rights Act, and state-law claims such as the Fair

---

[3] The Ninth Circuit affirmed the district court's award of $14,217 diversion-of-resources damages. *Id.* These included staff time investigating and litigating the complaints, testing costs, and tester recruitment. *Fair Housing of Marin v. Combs*, 2000 WL 365029, at *3 (N.D. Cal. March 29, 2000).

13

Employment and Housing Act, so too does Plaintiff. *See Combs*, 285 F.3d at 902, 905.

In addition, Plaintiff contends it suffered additional frustration-of-mission damages. Marquat declares:

> When a landlord engages in discrimination, it is extremely important for Project Sentinel to take action to counteract the effects of that discrimination. Although we do not know how many people of color called the phone number on the rental sign and never received a call back, defendants' race-based screening tactics likely affected more people than just the ones we know about. Likewise, this discrimination may have taken place at defendants' other rental properties. Defendants who discriminate at one rental property are likely to discriminate at all of their rental properties. The number of people of color prevented from applying during previous vacancies or at defendants' other rental properties is unknown. All of these practices frustrate Project Sentinel's mission.

(ECF No. 70 at 13).

Plaintiff contends its frustration of mission damages include: having to conduct future testing and training, having to monitor Defendants' future advertisements and records, having staff attorneys conduct trainings to counteract Defendants' conduct, and creating and mailing information concerning race discrimination and fair housing rights to the relevant census tract. (EF No. 70-2 at 3-4). In *Combs*, Fair Housing of Marin "suffered $10,160 in frustration of mission damages, namely for design, printing, and dissemination of literature aimed at redressing the impact Combs' discrimination had on the Marin housing market." 285 F.3d at 905. Plaintiff incurred these types of damages, too. (ECF Nos. 70 at 9-11 (discussing plan to counteract Defendants' conduct by, inter alia, printing and distributing brochures and Reynolds' distribution of such brochures); 84-1 at 2 (stating Plaintiff incurred $5,369.30 in damages for community outreach and brochure drops)).

Plaintiff has suffered the same type of diversion-of-resources and frustration-of-mission damages that Fair Housing of Marin did. Thus, as there, Plaintiff here "has direct standing to sue because it showed a drain on its resources from both a diversion of its resources and frustration of its mission." *Combs*, 285 F.3d at 905.

1

2

**B.      Service of Process**

1.      <u>Service on Jeanette Komar</u>

Under Federal Rule of Civil Procedure 4(e)(2)(B), a plaintiff may serve an individual in a judicial district of the United States by "leaving a copy of [the summons and complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there[.]"

On July 2, 2019, Plaintiff filed executed summonses for Defendants and then-defendant Meyer Komar. (ECF Nos. 4-6). The filings indicated that Meyer Komar was served personally at 1523 Gary Lane, Modesto, California, 95355, and the process server left additional copies of the relevant documents with Meyer Komar to serve Defendants. (*Id.*). Jeanette Komar owned that house with Meyer Komar. (ECF No. 71-4 at 3). Thus, Plaintiff properly served Jeanette Komar under Rule 4(e)(2)(B).

2.      <u>Service on Sarah Komar</u>

Plaintiff argues that it served Sarah Komar under California Code of Civil Procedure section 415.20(b), which is permitted by Federal Rule of Civil Procedure 4(e)(1). (ECF No. 82 at 4-7). In the alternative, Plaintiff argues due process was met here because substituted service was reasonably certain to inform Sarah Komar. (*Id.* at 7-8).

Under Rule 4(e)(1), an individual may also be served by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made[.]" Here, California law applies, as the Court is in, and the purported service occurred in, California. California's substituted service statute provides as follows:

> If a copy of the summons and complaint cannot with reasonable diligence be personally delivered to the person to be served, as specified in Section 416.60, 416.70, 416.80, or 416.90, a summons may be served by leaving a copy of the summons and complaint at the person's dwelling house, usual place of abode, usual place of business, or usual mailing address other than a United States Postal Service post office box, in the presence of a competent member of the household or a person apparently in charge of his or her office, place of business, or usual mailing address other than a United States Postal Service post office box, at least 18 years of age, who shall be informed of the contents thereof, and by thereafter

15

1
2

> mailing a copy of the summons and of the complaint by first-class mail, postage prepaid to the person to be served at the place where a copy of the summons and complaint were left.

3

Cal. Civ. Proc. Code § 415.20(b).

4

"Statutes governing substitute service shall be liberally construed to effectuate service and

5

uphold jurisdiction if actual notice has been received by the defendant." *Ellard v. Conway*, 94

6

Cal. App. 4th 540, 544 (2001) (internal quotation marks and citation omitted).

7

Plaintiff argues that the process server used reasonable diligence to accomplish personal

8

service by attempting to serve Sarah Komar at the Shady Valley Court home, which was her

9

business address and appeared to be her residence, five times. (ECF No. 82 at 5-6). Those

10

attempts constitute reasonable diligence. *See Bein v. Brechtel-Jochim Grp., Inc.*, 6 Cal. App. 4th

11

1387, 1391–92 (1992) ("Ordinarily, two or three attempts at personal service at a proper place

12

should fully satisfy the requirement of reasonable diligence and allow substituted service to be

13

made." (alterations, quotation marks and citation omitted)).

14

However, there is no evidence that 1523 Gary Lane was Sarah Komar's dwelling house,

15

usual place of abode, usual place of business, or usual mailing address. "It is crucial that a

16

connection be shown between the address at which substituted service is effectuated and the party

17

alleged to be served." *Corcoran v. Arouh*, 24 Cal. App. 4th 310, 315 (1994). Plaintiff does not

18

point the Court to any factually similar California cases finding that the type of service completed

19

here was proper.

20

There are, however, cases indicating that service was not accomplished. In *BMG Music v.

21

Clayton*, 2009 WL 5195873 (N.D. Cal. Dec. 22, 2009), Clayton allegedly infringed BMG's

22

copyrights while at an Arizona university. Unable to find her in Arizona, BMG determined that

23

Clayton's mailing address was in Petaluma, California, but was still unable to personally serve

24

her. *Id.* at *3. A process server served Clayton's father at the Petaluma address instead. At a

25

hearing, the father informed the court that Clayton did not live with him nor did Clayton receive

26

mail there. On these grounds, the court denied a motion for a default judgment:

27
28

> Plaintiffs' eight failed attempts to serve Defendant in person at 312 6th Street satisfied the reasonable diligence requirement of section 415.20(b) and warranted

16

Plaintiffs' attempt at substitute service. *See Bein,* 6 Cal.App.4th at 1393, 8 Cal.Rptr.2d 351 ("two or three" attempts are sufficient). Plaintiffs' counsel states that Defendant received substitute service at her regular mailing address pursuant to section 415.20(b). *See* Kerr Decl. at ¶¶ 22-23. While [the father] Val Clayton, who resides at 312 6th Street, claims that Defendant neither resides nor receives mail there, Plaintiff has shown it is her most current address. It appears that Defendant may be attempting to evade service and may know of the lawsuit through her father. At the same time, Val Clayton disputes that he accepted service for her at that address. Due process concerns require courts to ensure that every effort has been made to give defendants actual notice prior to entering default judgments against them. *See generally Mennonite Board of Missions,* 462 U.S. at 795; *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

Because there is a dispute as to whether substitute service was effected, the Court cannot be certain that Defendant had notice of this lawsuit, or that sufficient efforts have been made as of yet to give her notice.

*Id.* at *3-4.

As there, Plaintiff here was unable to effect personal service on a young adult defendant. Instead, Plaintiff attempted substituted service by serving the defendant's parent at the parent's house. And as in *Clayton*, it appears that Sarah Komar may know of the lawsuit through her parents, (*see* ECF No. 29 at 1-2) (in Meyer Komar's motion to dismiss, "Submitted by Meyer Komar (defendant for himself & Jeanette and Sarah Komar)"), and it is possible that she is evading service of process.

Sarah Komar's link to the house here appears even more attenuated than the defendant's in *Clayton* because in *Clayton*, records showed that Clayton lived at the address served. *See Clayton*, 2009 WL 5195873 at *3 ("The United States Postal Service confirmed that the address in question was Defendant's mailing address and that it listed no more recent mailing address for her."). Here, however, public records showed otherwise. (*See* ECF No. 82-3) (Accurint search results not showing 1523 Gary Lane as a possible address).

In sum, Plaintiff has not shown that Sarah Komar's place of abode was 1523 Gary Lane. Therefore, the Court finds that Plaintiff did not accomplish substituted service on her. *See Clayton*, 2009 WL 5195873, at *4; *see also Zirbes v. Stratton*, 187 Cal. App. 3d 1407, 1417-18 (1986) (substituted service of defendant at parent's residence not effective because public records

17

indicated defendant lived elsewhere).

Plaintiff also contends that service was proper because, under the facts presented here, Sarah Komar's due process rights have been satisfied. (ECF No. 82 at 7-8). Regardless of whether Sarah Komar's due process rights have been satisfied, Plaintiff does not point the Court to any cases showing that due process alone constitutes proper service.

The Court finds that Plaintiff did not adequately serve Sarah Komar. There can be no default judgment without service of process. Because Sarah Komar has not been served, the Court recommends denying the default judgment as to Defendant Sarah Komar and vacating the clerk's entry of default as to her only. The Court further recommends entering an order to show cause why Sarah Komar should not be dismissed without prejudice for failure to effect service of process, *see* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court--on motion or on its own after notice to the plaintiff--must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.").

**C.     Application of the *Eitel* Factors**

The Court now reviews the *Eitel* factors, 782 F.2d at 1471-72, for a default judgment as to Jeanette Komar.

### 1.     Prejudice to Plaintiff

Plaintiff will be prejudiced without a default judgment. Plaintiff lacks any recourse against Jeanette Komar without a default judgment, as she has proven herself unwilling to participate in this action. She has repeatedly contested the adequacy of her service despite the entry of a default against her, and she has not contested this motion for a default judgment. Thus, absent a default judgment, Plaintiff will have no effective relief against her. Accordingly, this *Eitel* factor weighs in favor of a default judgment.

### 2.     Substantive Merits and Sufficiency of Complaint

The Court will address the second and third *Eitel* factors together because they both "address the merits and sufficiency of the claims pled in the complaint." *Topete v. Ramos*

18

1    *Furniture*, No. 1:16-cv-271-DAD-EPG, 2018 WL 4006556, at *5 (E.D. Cal. Aug. 20,

2    2018), *report and recommendation adopted*, 2018 WL 6615107 (E.D. Cal. Nov. 16, 2018)

3    (quoting *Lyon v. Bergstrom Law, Ltd.*, No. 1:16-cv-401-DAD-SKO, 2017 WL 2350447, at *3

4    (E.D. Cal. May 31, 2017)) (addressing the factors together).

5         The District Court has already determined in this case that Plaintiff stated a claim against

6    Meyer Komar in its ruling denying his motion to dismiss. (ECF No. 50 at 4) ("Though defendant

7    has not challenged whether any of plaintiff's claims are adequately pled or legally sufficient, the

8    court has nonetheless taken the extra step of preliminarily reviewing the complaint and concludes

9    that plaintiff has alleged cognizable legal theories of housing discrimination and sufficient facts to

10   make its claims facially plausible.  Accordingly, defendant's motion under Rule 12(b), or

11   alternatively, Rule 12(c), must be denied."). However, the order only explicitly discusses

12   "housing discrimination," and Plaintiff's arguments now are tailored only to the FHA, FEHA and

13   Civil Rights Act of 1866. (ECF No. 69 at 11-13). The Civil Rights Act of 1866 argument is

14   cursory and does not firmly establish Defendants' liability. Thus, the only claims adequately

15   argued are Plaintiff's FHA and FEHA claims.

16        For completeness, the Court notes that Plaintiff has sufficiently alleged discrimination

17   under the FHA and FEHA. At the pleading stage, a plaintiff must plead the statutory elements of

18   an FHA claim:

19        the vitality of a fair housing complaint should be judged by the statutory elements
          of an FHA claim rather than the structure of the prima facie case. The FHA
20        provides a private right of action for an "aggrieved person" subjected to "an
          alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). The
21        Gilligans are "aggrieved persons" under the statutory definition because they
          "claim to have been injured by a discriminatory housing practice." § 3602(i). The
22        definition of "discriminatory housing practice" includes acts unlawful under 42
          U.S.C. § 3604.
23

24   *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 250 (9th Cir. 1997) (case citation omitted).

25        Plaintiff's complaint includes 42 U.S.C. § 3604(a) as a claim for relief. (ECF No. 1 at 8).

26   Under that section, it is unlawful to "to refuse to negotiate for the sale or rental of, or otherwise

27   make unavailable or deny, a dwelling to any person because of race … ." 42 U.S.C. § 3604(a).

28   ///

1    Thus, in this case, Plaintiff may adequately allege an FHA violation by alleging that: (1) it

2    is an aggrieved person, *Gillian*, 108 F.3d at 250, and (2) it was subject to a discriminatory

3    housing practice, *id.*, by (a) "mak[ing] unavailable" (b) "a dwelling," (c) "because of race," 42

4    U.S.C. § 3604(a).

5    Here, Plaintiff is an aggrieved person for the same reasons it has standing. It alleges

6    Defendants made the Property unavailable by refusing to return black testers' calls. The Property,

7    which Plaintiff alleges is a "three-unit residential rental property," (ECF No. 1 at 2), is a

8    "dwelling" under the FHA. *See* 42 U.S.C. § 3602(b) (" 'Dwelling' means any building … which

9    is occupied as, or designed or intended for occupancy as, a residence by one or more

10   families … ."). Plaintiff alleges that Sarah Komar returned white testers' callers, but not black

11   testers' callers and, hence, the dwelling was made unavailable because of race. Therefore,

12   Plaintiff has adequately pleaded a claim for discrimination under the FHA.

13   Because FEHA is at least as broad as the FHA, Plaintiff has adequately pleaded a FEHA

14   action too. *See* Cal. Gov't Code § 12955.6 ("Nothing in this part shall be construed to afford to

15   the classes protected under this part, fewer rights or remedies than the federal Fair Housing

16   Amendments Act of 1988 and its implementing[.]" (citations omitted)).

17   The fact that Sarah Komar will not be held liable does not affect Jeanette Komar's

18   liability. Based on the allegations of the complaint, Sarah Komar was Jeanette Komar's agent

19   because she was the representative who dealt with prospective tenants, (ECF No. 1 at 3), and

20   Plaintiff specifically alleged each defendant was an agent and acted within the scope of said

21   agency, (*id.* at 2). Thus, for these purposes, Jeanette Komar is liable for Sarah Komar's actions.

22   *See Holley v. Crank*, 400 F.3d 667, 673-74 (9th Cir. 2005) (real estate business owner liable for

23   employee's discrimination under Fair Housing Act); *Krug*, 564 F. Supp. 2d at 1150 ("Co-

24   Defendants Robert Krug, Elizabeth Krug, and Mr. Hodgkinson, all of whom owned the property

25   and for whom Ms. Hebert worked, are vicariously liable for Ms. Hebert's discriminatory acts

26   because she was acting in her role as an agent as she showed available units at the property."

27   (citing *id.* at 670-71). Accordingly, the Court finds that notwithstanding the lack of service on

28   Sarah Komar, Plaintiff's allegations are still sufficient to state claims under the FHA and FEHA

1    as to Jeanette Komar.

2         Therefore, the Court finds that these factors favor entering a default judgment on

3    Plaintiff's FHA and FEHA claims. However, as the remaining claims were insufficiently briefed,

4    the Court finds that this factor weighs against granting Plaintiff's motion as to all other claims.

5                    3.    Sum of Money in Relation to Seriousness of Conduct

6         The fourth factor considers "the amount of money at stake in relation to the seriousness of

7    [the defendant's] conduct." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d at 1176-77. "This

8    requires the court [to] assess whether the recovery sought is proportional to the harm caused by

9    [the] defendant's conduct." *Landstar Ranger, Inc. v. Parth Enters., Inc.*, 725 F. Supp. 2d 916, 921

10   (C.D. Cal. 2010) (citing *Walters v. Statewide Concrete Barrier, Inc.*, No. C 04–2559-JSW, 2006

11   WL 2527776, at *4 (N.D. Cal. Aug. 30, 2006)). "Default judgment is disfavored when a large

12   sum of money is involved." *See Moore v. Cisneros*, No. 1:12–cv–00188–LJO–SKO, 2012 WL

13   6523017, at *4 (E.D. Cal. Dec. 12, 2013) (citation omitted); *see also BR North 223, LLC v.

14   Glieberman*, No. 1:10–cv–02153 LJO–BAM, 2012 WL 639500, at *5 (E.D. Cal. Feb. 27, 2012)

15   ("In general, the fact that a large sum of money is at stake is a factor disfavoring default

16   judgment." (citations omitted)). "The Court considers [a plaintiff's] declarations, calculations,

17   and other documentation of damages in determining if the amount at stake is reasonable." *HICA

18   Educ. Loan Corp. v. Warne*, No. 11–CV–04287–LHK, 2012 WL 1156402, at *3 (N.D. Cal. Apr.

19   6, 2012) (citation omitted).

20        Here, Plaintiff seeks $33,812.67 in damages and $76,075 in attorneys' fees and costs

21   against two individuals—although the Court recommends granting default judgment against only

22   one of them. That money is a substantial sum for an individual. However, Jeanette Komar's

23   alleged conduct is very serious: i.e., discriminating against renters based on their race. Overall,

24   this factor weighs in favor of a default judgment.

25                    4.    Possibility of Dispute

26        No genuine issue of material fact is likely to exist because the allegations in the complaint

27   are taken as true, *Televideo Sys.*, 826 F.2d at 917-18, and Jeanette Komar has submitted nothing

28   of substance to contradict the well-pleaded allegations despite her knowledge of this case.

21

1   Accordingly, this factor favors entry of default judgment.

2                   5.      Whether the Default was Due to Excusable Neglect

3          Jeanette Komar is aware of this action, as evidenced by her filing letters with the Court.

4   (*See* ECF Nos. 41, 52). Plaintiff's counsel also avers they have corresponded and Jeanette Komar

5   referred to "Project Sentinel versus Komar" in a voicemail she left with counsel. (ECF No. 71 at

6   9). Nevertheless, Jeanette Komar has refused to participate meaningfully in this action. Thus, this

7   factor weighs in favor of granting default judgment.

8                   6.      Policy Favoring Decisions on the Merits

9          This factor inherently weighs strongly against awarding default judgment in every case. In

10   the aggregate, however, this factor is outweighed when compared with the other applicable

11   factors that weigh in favor of granting default judgment.

12         In summary, six of the seven factors weigh in favor of default judgment. In the aggregate,

13   the factor favoring decisions on the merits is outweighed when compared with the other factors,

14   which weigh in favor of granting default judgment. Accordingly, the *Eitel* factors weigh in favor

15   of entering default judgment.

16         **D.      Terms of Judgment**

17         On a motion for a default judgment, the relief sought may not be different in kind from, or

18   exceed in amount, what is demanded in the complaint. Fed. R. Civ. P. 54(c). Furthermore, a

19   plaintiff is required to prove all damages sought in the complaint. *See TeleVideo Sys., Inc.*, 826

20   F.2d at 917–18. "[A] default judgment must be supported by specific allegations as to the exact

21   amount of damages asked for in the complaint." *Philip Morris USA, Inc. v. Castworld Prod., Inc.,*

22   219 F.R.D. 494, 499 (C.D. Cal. 2003). A court looks to plaintiff's "declarations, calculations, and

23   other documentation of damages in determining if the amount at stake is reasonable." *United*

24   *States v. Yermian*, 2016 WL 1399519, at *3 (C.D. Cal. Mar. 18, 2016) (internal citations omitted).

25   If the facts necessary to determine the damages are not contained in the complaint, or are legally

26   insufficient, they will not be established by default. *See Cripps v. Life Ins. Co. of N. Am.*, 980

27   F.2d 1261, 1267 (9th Cir. 1992). Courts have granted injunctive relief in default judgments in

28   FHA cases. *See, e.g., Hous. Rts. Ctr. v. Snow*, 2007 WL 91148, at *3-4 (E.D. Cal. Jan. 3, 2007)

22

1  (when granting motion for default judgment, enjoining defendants from discriminating in

2  violation of the FHA or FEHA).

3        Plaintiff, both now and in the complaint, seeks monetary damages, injunctive relief, and

4  attorneys' fees and costs. (*Compare* ECF No. 1 at 11-12 (prayer for relief) *with* ECF Nos. 68 at 1

5  (motion for default judgment); 69 at 19-20 (memorandum of points and authorities detailing the

6  requested injunctive relief)). Plaintiff also seeks attorneys' fees and costs.

7                1.    Damages

8        Fair housing agencies may receive compensatory damages for claims brought under the

9  Fair Housing Act. 42 U.S.C. § 3613(c) (permitting award of actual and punitive damages

10 attorneys' fees and costs); *Combs*, 285 F.3d at 906 (affirming award for compensatory damages

11 for diversion of resources and frustration of mission). So, too, with claims under FEHA. Cal.

12 Gov't Code §§ 12955.6 ("Nothing in [FEHA] shall be construed to afford to the classes protected

13 under this part fewer rights or remedies than the federal Fair Housing Amendments Act of 1988

14 and its implementing regulations . . . ." (citations omitted), 12989.2(a) (permitting FEHA plaintiff

15 to recover damages)).

16       Plaintiff seeks $24,322.67 in diversion-of-resources damages and $9,490 in frustration-of-

17 mission damages, as per the table below:

| ITEM | AMOUNT |
|---|---|
| Staff Time | $17,640.53 |
| Testing and Investigation Expenses | $1,201.96 |
| Out of Pocket expenses | $110.88 |
| Community outreach activities, including staff time and expenses | $5,369.30 |
| **Total Diversion of Resources Damages** | **$24,322.67** |
| Future testing | $1,800 |
| Future training of defendants/agents | $2,400 |
| Future monitoring of defendants | $2,100 |
| Future community outreach activities | $3,190 |
| **Total Frustration of Mission Damages** | **$9,490** |
| **Grand Total** | **$33,812.67** |

26 (ECF No. 84 at 4-5).

27                i.   Staff Time

28       Staff time is a compensable type of diversion-of-resources damage. *See, e.g., Krug*, 564 F.

1    Supp. 2d at 1146-48 (awarding diversion-of-resources damages in part for staff time); *cf. S. Cal.*

2    *Hous. Rts. Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1069 (C.D. Cal.

3    2005) ("the Housing Rights Center has standing because it presents evidence of actual injury

4    based on loss of financial resources in investigating this claim and diversion of staff time from

5    other cases to investigate the allegations here.").

6        Here, Plaintiff seeks compensation for the time of eight of its staff members. Plaintiff

7    requests hourly rates from between $175 for its testing coordinator to $375 for its litigation

8    director. (ECF Nos. 70-2 at 2; 84 at 3-4). Plaintiff attaches time logs for its staff members. (ECF

9    No. 70-3). The Court has reviewed these records and finds the times are compensable.

10                    ii.   Testing and Investigation Expenses

11        Testing expenses can be compensable as diversion-of-resources damages. *Combs*, 285

12    F.3d at 905 ("Fair Housing's resources were diverted to investigating and other efforts to

13    counteract Combs' discrimination above and beyond litigation."); *S. Cal. Hous. Rts. Ctr.*, 426 F.

14    Supp. 2d at 1069 ("the Housing Rights Center has standing because it presents evidence of actual

15    injury based on loss of financial resources in investigating this claim and diversion of staff time

16    from other cases to investigate the allegations here.").  The district court the Ninth Circuit

17    affirmed in *Combs* concluded that "the $898 requested in testing costs and tester training is

18    equally appropriate and reasonable as a measure of diversion of resources damages." *Fair Hous.*

19    *of Marin v. Combs*, 2000 WL 365029, at *3 (N.D. Cal. Mar. 29, 2000). The Ninth Circuit

20    specifically affirmed "the district court's finding that Fair Housing's resources were diverted to

21    investigating and other efforts to counteract Combs' discrimination above and beyond litigation."

22    *Combs*, 285 F.3d at 905.

23        Here, Marquat declares that the costs of testing include not only the amounts paid to the

24    testers but also the costs of hiring and training the testers. (ECF No. 70 at 4). "As a result of the

25    expenses and time that are required to run a testing program, HUD contracts and grants to fair

26    housing agencies typically value a paired test between $600 and $1,500, depending on the type of

27    test." (*Id.* at 12). Plaintiff here seeks $1,201.96 for its testing costs, (ECF No. 84 at 4),

28    representing $275 for each of the four phone tests plus a stipend. These types of costs are

1  compensable. *See Combs*, 285 F.3d at 905. The Court finds that Plaintiff's testing and

2  investigation expenses constitute a diversion of its resources.

3  iii.   Out-of-Pocket Expenses

4  Plaintiff claims $110.88 in out-of-pocket expenses, which appear to be for printing

5  brochures and copying. (ECF Nos. 70-2 at 2; 84 at 4). These were part of Plaintiff's work to

6  combat Defendants' discrimination:

7  > Project Sentinel's testing uncovered clear evidence of discrimination, Project
   > Sentinel devised and implemented a plan to counteract that discrimination. That
8  > plan included distributing fair housing brochures at various Stanislaus County
   > agencies, staffing a booth at a community health fair, and giving a presentation at
9  > the local chapter of the NAACP.

10  (ECF No. 70 at 9-10).

11  As these costs were incurred directly to counteract Defendants' discrimination, they are

12  compensable damages.[4]

13  iv.   Community Outreach Activities

14  Plaintiff seeks $5,369.30 in damages for community outreach expenses, including related

15  staff time and expenses. (ECF No. 84 at 3-4). Plaintiff has properly documented those expenses,

16  and the staff time therein has been separated from the staff-time mentioned above. (ECF Nos. 70-

17  2 at 2; 70-3 at 2, 5, 7; 84 at 2-4). These out-of-pocket expenses are for mileage and thus are in

18  addition to the costs for copying and brochures calculated separately. (ECF No. 84 at 3-4).

19  Therefore, these are compensable expenditures. *See Combs*, 285 F.3d at 905 ("With respect to

20  frustration of mission, the district court found that Fair Housing suffered $10,160 in frustration of

21  mission damages, namely for design, printing, and dissemination of literature aimed at redressing

22  the impact Combs' discrimination had on the Marin housing market."); *see also Friends of the*

23  *Earth*, 2021 WL 1205023, at *2 (characterizing "design[ing] and disseminat[ing] literature to

24  redress the effects of the challenged discrimination" as  diversion-of-resources damages).

25

26  ---

[4] The Court notes that although these costs were tabulated as diversion-of-resources damages, they might be
27  considered frustration-of-mission damages instead. *See Combs*, 285 F.3d at 905 ("With respect to frustration of
mission, the district court found that Fair Housing suffered $10,160 in frustration of mission damages, namely for
design, printing, and dissemination of literature aimed at redressing the impact Combs' discrimination had on the
28  Marin housing market."). However, these costs are not double counted and are compensable in any event.

v.   Future Activities

Plaintiff also seeks damages for the costs of activities it intends to take in the future to combat the frustration of their mission: testing, training Defendants and their agents, monitoring costs, and community outreach costs. (ECF Nos. 70 at 12-14; 84 at 5). These costs are compensable. *See Krug*, 564 F. Supp. 2d at 1153 ("HRC's frustration of mission damages include compensation for the costs that HRC will incur to counteract Defendants' discriminatory actions. These costs include future on-site tests and surveys to monitor the property; fair housing education for the subject property tenants; fair housing management education for Defendants and their agents; and future advertising costs in the Pasadena Star News."); *Combs*, 285 F.3d at 903-04 ("Expenditures to reach out to potential home buyers or renters who are steered away from housing opportunities by discriminatory advertising, or to monitor and to counteract on an ongoing basis public impressions created by defendants' use of print media, are sufficiently tangible to satisfy Article III's injury-in-fact requirement." (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27-29 (D.C. Cir. 1990)).

vi.   Conclusion

Plaintiff has established $33,812.67 in compensatory damages. The Court therefore recommends awarding that amount.

2.   <u>Injunctive Relief</u>

i.   Availability of and Legal Standards for Injunctions

Injunctive relief is available under both the FHA and FEHA. In civil actions brought under the FHA, "if the court finds that a discriminatory housing practice has occurred or is about to occur, the court … may grant as relief, as the court deems appropriate, any permanent or temporary injunction … or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)." 42 U.S.C. § 3613(c)(1). Likewise, in civil actions brought under the FEHA, "the court … may grant other relief, including the issuance of a temporary or permanent injunction … as it deems appropriate to prevent any defendant from engaging in or continuing to engage in an unlawful practice." Cal. Gov't Code § 12989.2.

26

Thus, "[w]here a fair housing violation has occurred, 'a district court has broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs.' " *Krug*, 564 F. Supp. 2d at 1145 (quoting *Atkins v. Robinson,* 545 F.Supp. 852, 889 (E.D.Va. 1982), *aff'd,* 733 F.2d 318 (4th Cir. 1984)); *see also Snow*, 2007 WL 91148, at *3-4 (granting injunctive relief in connection with default judgment under Fair Housing Act and FEHA). "Injunctive relief should be structured to achieve the twin goals of insuring that the Fair Housing Act is not violated in the future and removing any lingering effects of past discrimination." *Krug*, at 1145 (quoting *Marable v. Walker,* 704 F.2d 1219, 1221 (11th Cir. 1983)).

Typically, parties seeking permanent injunctions must satisfy a four-part test: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction," *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 977 (9th Cir. 2017) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 141 (2010)).

The Ninth Circuit has held, however, that for permanent injunctions under the FHA, the first element is presumed to be satisfied. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) (in FHA case, holding "[t]he standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief" and vacating district court's denial of motion for injunction because "where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation").

It is worth noting that Central District of California has found that all that must be proven is a violation of the Fair Housing Act: "Where injunctive relief is expressly authorized by statute, proof that the defendant violated such statute is sufficient to support an injunction remedying those violations" and thus when defendants are "adjudged guilty of fair housing and anti-discrimination violations, Plaintiffs have provided evidence sufficient to support a grant of

injunctive relief." *Inland Mediation Bd. v. City of Pomona*, 158 F. Supp. 2d 1120, 1162 (C.D. Cal. 2001); *accord Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) ("when a plaintiff who has standing to bring suit shows a substantial likelihood that a defendant has violated specific fair housing statutes and regulations, that alone, if unrebutted, is sufficient to support an injunction remedying those violations." (citing *TOPIC v. Circle Realty*, 377 F.Supp. 111, 114 (C.D.Cal.1974), *rev'd on other grounds*, 532 F.2d 1273 (9th Cir. 1975))).

ii.   Analysis

(a)      Form of Injunctive Relief

Plaintiff sought injunctive relief in its complaint. In its prayer for relief, Plaintiff sought the Court to:

a. Permanently enjoin Defendants from engaging in discriminatory housing practices, either directly or through others;

b. Order Defendants to take appropriate affirmative actions to ensure that the activities complained of above are not engaged in by them again;
. . .
e. Order Defendants to add language to all advertisements for rentals at properties owned and/or managed by Defendants that Defendants are Equal Housing Opportunity Providers;

f. Direct Defendants and those operating or managing housing on Defendants' behalf to arrange for and attend, at Defendants' expense, training regarding fair housing obligations of housing providers under applicable law;

(ECF No. 1 at 11-12).

Now, Plaintiff seeks an injunction with the following terms:

1.  Defendants are permanently enjoined from discriminating in the rental of dwellings based on any of the characteristics protected by the Fair Housing Act, FEHA, and the Unruh Act;

2.  Defendants and all agents who have contact with rental applicants or tenants are required to attend yearly training regarding the fair housing laws with Project Sentinel or another HUD-approved agency for a period of no less than five years, or until they have sold all of their rental properties;

3.  Defendants must provide a copy of the DFEH pamphlet entitled "Fair Housing" (DFEH- H03B) to all current tenants and to all applicants for a period of not less than five years;

1

2       4.  Defendants must offer alternative forms of communication for rental inquiries

3   besides phone; for example, defendants must also include an email address, rental

    agent location, or an open-house date, or provide at least one method besides a

4   phone number for prospective tenants to inquire about or apply for vacancies.

5       5.  In all ads, website listings, or signs regarding rental vacancies, defendants

    must use the fair housing logo or tagline, "Equal Opportunity Housing Provider,"

6   or similar words;

7       6.  Defendants must maintain all records of rental inquiries and rental

    applications, tenant records, and move-out records for a period of not less than

8   five years, and to make such records available to Project Sentinel upon Project

    Sentinel's request after receiving an allegation of discrimination.

9

10  (ECF No. 69 at 19-20).

11      Paragraphs 1, 2, and 5 are substantially the same as the injunctive relief sought in the

12  complaint in paragraphs (a), (e) and (f) in the complaint with one notable exception: the

13  complaint does not mention the Unruh Act. Thus, other than with respect to the Unruh Act, they

14  are not "different in kind from" what Plaintiff sought in the pleadings. *See* Fed. R. Civ. P. 54(c).

15      Requests 3, 4 and 6 arguably fall within Plaintiff's catchall request for relief: "b.  Order

16  Defendants to take appropriate affirmative actions to ensure that the activities complained of

17  above are not engaged in by them again[.]" (ECF No. 1 at 12). Although Plaintiff's specific

18  requests now are not explicitly enumerated in the complaint, they are not "different in kind," as

19  would be barred by Rule 54(c)(1), because they are injunctive orders for "Defendants to take

20  appropriate affirmative actions to ensure that the activities complained of above are not engaged

21  in by them again," (ECF No. 1 at 12).

22      These forms of relief are similar to what other courts have granted. *See, e.g., Snow*, 2007

23  WL 91148 at *3-5 (injunction included ordering defendants not to violate FEHA or the FHA; "to

24  undergo yearly fair housing training to be provided by [plaintiff]," at defendants' expense; to

25  maintain fair housing sign and require defendants to use words "Equal Housing Opportunity

26  Provider" or related logo in all advertising; maintain various records related to defendants

27  showing and letting properties); *Mairs v. Gilbreath*, 2002 WL 34272404 at *3-4 (C.D. Cal. Oct.

28  10, 2002) (affirmative injunction including specific terms about defendants following anti-

discrimination law, advertising, training, recordkeeping, and reporting to non-party Housing Rights Center); *Krug*, 564 F. Supp. 2d at 1154-55 (similar). However, the Court notes that the other cases granting injunctive relief were more specific in their requirements for how to comply with FEHA and the FHA. The Court will therefore recommend using more targeted language to provide Jeanette Komar with greater clarity by adopting the same injunctive language used in *Snow*, 2007 WL 91148 at *3-4.

                                      (b)       Application to Permanent Injunction Standards

To the extent Plaintiff needs only to prove a violation of the FHA to receive an injunction, Plaintiff has done so. *See Inland Mediation Bd.*, 158 F. Supp. 2d at 1162 ("Where injunctive relief is expressly authorized by statute, proof that the defendant violated such statute is sufficient to support an injunction remedying those violations.").

Nevertheless, Plaintiff also meets the other parts of the larger four-part test.[5] Plaintiff has no adequate remedy to force Jeanette Komar to comply with the law. The relief the Court recommends permitting is limited and is targeted to preventing further discrimination. The value to the public in enforcing anti-discrimination laws far exceeds any burden on Jeanette Komar. Finally, "[t]he public interest has been authoritatively declared by Congress in its enactment of the FHA." *Bischoff v. Brittain*, No. 2:14-CV-01970-KJM, 2014 WL 5106991, at *9 (E.D. Cal. Oct. 10, 2014) (in considering preliminary injunction).

                               3.    Attorneys' Fees and Costs

The FHA and FEHA each provide that a court, "in its discretion," may award reasonable attorneys' fees and costs to a prevailing party. 42 U.S.C. § 3613(c)(2); Cal. Gov't Code § 12989.2; *accord Davis v. Sundance Apartments*, 2008 WL 3166479, at *1 (E.D. Cal. Aug. 5, 2008) ("The Fair Housing Act, FEHA and the Unruh Civil Rights Act each provide a statutory basis for an award of attorneys' fees and costs in this case."); *Combs*, 285 F.3d at 907-08 (affirming award of attorneys' fees in FHA and FEHA case as part of default judgment); *Ingram*

---

[5] Those factors are: "([1]) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; ([2]) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and ([3]) that the public interest would not be disserved by a permanent injunction[.]" *Arizona Dream Act Coal.*, 855 F.3d at 977.

1   *v. Oroudjian*, 647 F.3d 925, 926-28 (9th Cir. 2011) (per curiam) (affirming award of attorneys'

2   fees to plaintiffs under FHA and FEHA). FEHA, in particular, also states that expert witness fees

3   are recoverable. Cal. Gov't Code § 12989.2 ("In a civil action brought under this section, the

4   court may, at its discretion, award the prevailing party … expert witness fees … ."). "A prevailing

5   party must be one who has succeeded on any significant claim affording it some of the relief

6   sought, either *pendente lite* or at the conclusion of the litigation." *Texas State Tchrs. Ass'n v.*

7   *Garland Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989).

8          "[U]nder the federal fee shifting statutes the lodestar amount is the guiding light in

9   determining a reasonable fee." *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1176

10   (9th Cir. 2010) (internal punctuations and citations omitted); *see also Ingram*, 647 F.3d at 927-28

11   (affirming district court's use of lodestar calculation in attorneys' fees award under the FHA and

12   FEHA). "The 'lodestar' amount is calculated by multiplying the number of hours the prevailing

13   party reasonably expended on the litigation by a reasonable hourly rate." *Ferland v. Conrad*

14   *Credit Corp.*, 244 F.3d 1145, 1149 n.4 (9th Cir. 2001) (citations omitted).

15          Reasonable hourly rates are calculated by reference to "prevailing market rates in the

16   relevant community," with a special emphasis on fees charged by lawyers of "comparable skill,

17   experience, and reputation." *Davis v. City of San Francisco*, 976 F.2d 1536, 1546 (9th Cir. 1992),

18   *vacated on other grounds*, 984 F.2d 345 (9th Cir. 1993). Generally, when determining a

19   reasonable hourly rate, the relevant community is the forum in which the district court sits.

20   *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (citation omitted).

21          As to the hours reasonably expended, "[t]he district court also should exclude from this

22   initial fee calculation hours that were not reasonably expended. Cases may be overstaffed, and the

23   skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good

24   faith effort to exclude from a fee request hours that are excessive, redundant, or

25   otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude

26   such hours from his fee submission." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (concerning

27   fee awards under 42 U.S.C. § 1988).

28

1    i. Prevailing Party

2    "Courts consistently confirm that 'a party in whose favor a judgment is rendered is

3    generally the prevailing party for purposes of awarding costs under Rule 54(d).' " *San Diego*

4    *Police Officers' Ass'n v. San Diego City Employee's Ret. Sys.*, 568 F.3d 725, 741 (9th Cir. 2009).

5    "These [general attorneys' fees] principles apply equally to prevailing parties who obtain

6    a default judgment in a civil rights action." *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152,

7    1158 (9th Cir. 2018); *cf. Combs*, 285 F.3d 908 (affirming attorneys' fees award in default

8    judgment after noting magistrate judge "made careful findings and calculations in making the

9    recommendation" including about "the hourly billing rates" and "the actual number of hours

10   spent").

11   Here, the Court finds that Plaintiff has prevailed as to Jeanette Komar but has not

12   prevailed as to Sarah Komar for lack of service. Meyer Komar was previously dismissed.

13   However, Plaintiff alleges that the three of them acted in concert and the Court finds that Jeanette

14   Komar is jointly and severally liable for the amounts expended prosecuting the claims. However,

15   the Court will recommend reducing the amount of fees awarded to the extent the hours expended

16   dealt with Sarah Komar or Meyer Komar only. *See Cunningham v. Cty. of Los Angeles*, 879 F.2d

17   481, 486 (9th Cir. 1988) ("The mere fact that plaintiff was not victorious as to all defendants does

18   not automatically bar an attorney's fees award. However, the amount of attorney's fees they

19   receive should be based on the work performed on the issues in which they were successful.");

20   *Finkelstein v. Bergna*, 804 F. Supp. 1235, 1256 (N.D. Cal. 1992) ("We conclude (and plaintiff

21   apparently concedes) that it is not reasonable to make the county defendants pay for hours spent

22   by plaintiff's counsel in his unsuccessful claims against the media defendants.").

23   ii. Reasonable Hourly Rate

24   Here, Plaintiff seeks hourly rates of $450 for its attorney, Liza Cristol-Deman, and $110

25   for legal assistants.

26   Counsel was admitted to the California bar in 1997 and is a partner at Brancart &

27   Brancart. She has extensive experience litigating fair-housing cases in state and federal courts.

28   (ECF No. 71 at 16-17). Plaintiff argues $450 is appropriate because counsel was awarded that rate

32

1    in the San Mateo County Superior Court and because it is in line with fee awards in this district

2    for attorneys practicing other specialized areas of law. (ECF No. 69 at 20-22).

3          The work counsel performed in the San Mateo County Superior Court is not relevant for

4    present purposes. San Mateo County Superior Court falls within the Northern District of

5    California. Plaintiff is now litigating in the Eastern District. Accordingly, "[t]he relevant legal

6    community is the Fresno Division of the Eastern District of California." *Lehr v. Sierra*

7    *Ambulance Serv.*, No. 1:18-CV-831 AWI BAM, 2018 WL 6445687, at *7 (E.D. Cal. Dec. 10,

8    2018); *see also Gonzalez v. City of Maywood*, 729 F.3d 1196, 1205 (9th Cir. 2013) ("Generally,

9    when determining a reasonable hourly rate, the relevant community is the forum in which the

10   district court sits." (citation and internal quotation marks omitted)). Only "if local counsel was

11   unavailable, either because they are unwilling or unable to perform because they lack the degree

12   of experience, expertise, or specialization required to handle properly the case" can rates outside

13   the district be used. *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997) (affirming district court's

14   decision to use local market's rates after finding "insufficient evidence that competent local

15   counsel was available"). Plaintiff does not argue that local counsel was unavailable (or that the

16   cited state-court proceeding informs the rate of this federal-court proceeding). Therefore, the

17   Court will not rely on those grounds.

18         "[C]ourts in the Eastern District of California Fresno Division have approved hourly rates

19   ranging from $200.00 to $550.00 per hour." *Salgado v. T-Mobile USA, Inc.*, No. 1:17-CV-0339-

20   JLT, 2020 WL 3127931, at *20 (E.D. Cal. June 12, 2020) (in lodestar cross-check for

21   employment-law class-action case). Thus, hourly rates of $450 or above are found reasonable for

22   experienced attorneys in employment-law class-action cases. *Englert v. City of Merced*, No. 1:18-

23   CV-01239-NONE-SAB, 2020 WL 2215749, at *13 (E.D. Cal. May 7, 2020), *report and*

24   *recommendation adopted*, 2020 WL 2732031 (E.D. Cal. May 26, 2020) ($450 found reasonable

25   for lodestar crosscheck for attorney with 19 years' experience); *Urena v. Central California*

26   *Almond Growers Assn.*, No. 1:18-cv-00517-NONE-EPG, 2021 WL 942086, at *16 (E.D. Cal.

27   Mar. 12, 2021) (in undersigned's pending findings and recommendations, recommending using

28   $530 hourly rate for lodestar cross-check purposes for partner with 24 years' experience). As

1    Plaintiff noted, the undersigned awarded $450 per hour to a counsel with over 30 years'

2    experience in *E. & J. Gallo Winery v. Strategic Materials, Inc.*, 2019 WL 6727566, at *5 (E.D.

3    Cal. Dec. 11, 2019), which was a complex commercial dispute.  Thus, the Court finds that a $450

4    hourly rate is appropriate for counsel here.

5             Plaintiff also seeks an hourly rate of $110 for paralegals. "Generally, paralegal rates

6    within the Fresno Division of the Eastern District range between $75 to approximately $150.00."

7    *Durham v. FCA US LLC*, No. 2:17-CV-00596-JLT, 2020 WL 243115, at *9 (E.D. Cal. Jan. 16,

8    2020). The $110 rate falls near the middle of the range. The Court finds the amount reasonable.

9                                    iii.   Hours Expended

10            Plaintiff seeks to recover 162.7 hours for counsel's work. As discussed above, these

11   attorney fee awards are only being charged to Jeanette Komar. Thus, hours counsel and paralegals

12   spent on the motions to compel Meyer Komar to engage in discovery or to serve Sarah Komar are

13   not compensable. Accordingly, the Court finds that the following hours should not be charged to

14   Jeanette Komar:

15                         (a)        Non-Compensable Time Entries for Counsel

16

| Date | Description | Hours |
|---|---|---|
| 9/9/2019 | search for possible new addresses for Sarah Komar | 0.2 |
| 9/9/2019 | issue default letter to additional S Komar address | 0.1 |
| 9/12/2019 | work with SD to locate new address for S Komar (0.1); email and call PI to serve new address (0.2); prepare dec in support of request for default (0.2)[6] | 0.5 |
| 9/19/2021 | email from Gary E re attempted service on Sarah in Sonora (0.1); check online for additional location info (0.2); check Dept of Ins for service info and call them re same (0.6); em Dept of Ins re same (0.2) | 1.1 |
| 9/19/2021 | Research service optionss for Sarah (0.4) | 0.4 |
| 9/27/2019 | confer with Chris Brancart re motion to compel and re RFAs | 0.1 |
| 10/1/2019 | prepare motion to compel Initial Disclosures | 0.9 |
| 10/2/2019 | prep brief for motion to compel Initial Disclosures (2.2); prep dec for motion to compel (.5); prep proposed order (0.2); efile all docs (.2) | 3.1 |

------

[6] The 0.2 hours spent preparing a declaration for a default judgment is compensable. Thus, the Court will permit recovery on that time.

34

| Date | Description | Hours |
|---|---|---|
| 10/3/2019 | email from Meyer re motion to compel and reply | 0.1 |
| 10/4/2019 | review minute order and cal new date for motion to compel hearing | 0.1 |
| 11/14/2019 | prep for informal disco conf and email clerk re letter | 0.1 |
| 11/15/2019 | court call re informal discovery conf | 1 |
| 11/15/2019 | review motion in prep for court call | 0.1 |
| 1/23/2020 | email from Komar responding to M&C request over disco and reply (0.2); review court procedure for informal disco conf and email Komar with possible times for call with judge (0.1) | 0.3 |
| 1/24/2020 | prepare letter brief | 1.5 |
| 1/27/2020 | finish letter to court for informal disco conf (0.7); mark exhibits for same (0.1) | 0.8 |
| 2/12/2021 | review and analyze discovery responses from def for follow up Rule 37 letter (1.2); prepare email under Rule 37 (.9) | 2.1 |
| 2/19/2020 | email def re continuing mid disco conf (0.1); prepare application to continue with proposed order (0.4); efile and email order to chambers (0.1) | 0.6 |
| 2/20/2020 | email from Komar re illness and disco; reply | 0.1 |
| 2/20/2020 | review court order continuing JSC and calendar dates | 0.1 |
| 5/4/2020 | prepare motion to compel disco | 1.4 |
| 5/6/2020 | work on Rule 37 motion | 1.6 |
| 5/7/2020 | work on motion to compel | 3.6 |
| 5/8/2020 | work on motion to compel | 0.4 |
| 5/12/2020 | work on motion | 4 |
| 5/13/2020 | prep declaration for motion to compel (2.9); revise brief and research same (1.2) | 4.6 |
| 5/14/2020 | work on exhibits and citations for motion to compel | 2 |
| 5/15/2020 | finalize motion to compel (1.5); efile and serve all docs (0.3) | 1.8 |
| 5/20/2020 | review ECF canceling hearing on motion to compel | 0.1 |
| 6/24/2020 | email from clerk re PO for motion to compel and reply; prepare proposed order | 0.6 |
| 6/25/2020 | prepare proposed order | 2.9 |
| 7/7/2020 | review order granting motion to compel and calendar all dates in order | 0.3 |
| 7/17/2020 | revise notice re fees and prepare dec for same; efile and serve | 1.2 |
| **TOTAL** | | **37.6[7]** |

Upon review, the Court finds the remaining hours from counsel were reasonably

---

[7] This column adds up to 37.8 hours. However, as 0.2 hours are being added back to compensable time, the Court will subtract only 37.6 hours.

1  expended. Therefore, the Court finds counsel should be awarded her hourly rate for 125.1 hours.

2  (b)   Non-Compensable Time Entries for Paralegals

3  The Court has also reviewed the time logs for Plaintiff's paralegals. (ECF No. 71-7). The

4  Court notes that counsel has already reduced the expenditures. For instance, counsel reduced

5  Ronnie Hodgkinson's hours by 1.7—presumably for the 1.7 hours spent on "Converting outlook

6  emails to PDF" and "Preparing mail to send to defendants." (*Id.* at 4). Likewise, Matthew Dahl's

7  billable amount has been reduced by $22, presumably for the 0.2 hours spent on "run cost report."

8  (*Id.* at 5). Spencer Campbell's costs have been reduced by $847, or 7.7 hours. (*Id.* at 3). However,

9  the Court finds that the following 14.2 hours of Spencer Campbell's costs are either non-

10 compensable because they are clerical, relate to the motions to compel Meyer Komar, or relate to

11 service on Sarah Komar:

| Date | Entry Notes | Hours |
|------|-------------|-------|
| 8/5/2019 | Scanning documents | 0.5 |
| 8/12/2019 | Scanning/saving response | 0.5 |
| 8/29/2019 | mailing letters to defendants in danger of default | 1 |
| 9/3/2019 | Served documents by mail to defendants | 0.5 |
| 9/20/2019 | Mailing notice of request for default | 1 |
| 10/2/2019 | Proofing motion to compel Komar init. disclosures | 0.5 |
| 10/2/2019 | saving ecfs, printing, preparing envelope for service on defendant | 0.4 |
| 10/2/2019 | Prepping mailing of retainer agreement, incl. drafting retainer cover letter | 0.5 |
| 10/17/2019 | Assisting w proofreading and service of Request for Admissions | 0.7 |
| 10/30/2019 | downloading and saving ecfs | 0.1 |
| 11/4/2019 | saving ecfs | 0.2 |
| 12/4/2019 | Finalizing drafting of requests for production | 1.2 |
| 1/22/2020 | Setting up courtcall appearance for Liza Cristol-Deman | 0.4 |
| 1/27/2020 | Proofreading LCD letter to judge re ongoing discovery dispute | 0.2 |
| 3/5/2020 | Saving ecfs | 0.1 |
| 4/23/2020 | saving ecfs | 0.1 |
| 4/29/2020 | saving ecf | 0.1 |

| Date | Entry Notes | Hours |
|---|---|---|
| 5/11/2020 | Converting + downloading files sent over by expert re statistical analysis of last names for racial data | 0.6 |
| 5/14/2020 | Preparing Table of Authorities | 1.1 |
| 5/15/2020 | Preparing table of contents for motion to compel | 1.6 |
| 5/15/2020 | preparing exhibits for motion to compel | 0.9 |
| 5/15/2020 | Saving ecfs from motion to compel | 0.5 |
| 5/15/2020 | Saving ecfs from motion to compel | 0.5 |
| 6/25/2020 | proofreading motion to compel discovery | 0.2 |
| 8/20/2020 | saving ecf | 0.1 |
| 8/25/2020 | Re-adding self to ecf distribution | 0.1 |
| 12/9/2020 | saving ecf, re-adding self to ecf distribution | 0.3 |
| 12/10/2020 | saving ecf | 0.1 |
| 12/18/2020 | Serving filed docs re motion to dismiss claims against Meyer Komar via mail, reviewing pleadings | 0.2 |
| **TOTAL** | | **14.2** |

With these reductions, the Court finds that Spencer Campbell reasonably expended 8.5 hours, Ronnie Hodgkinson reasonably expended 9.1 hours, and Matthew Dahl reasonably expended 1.9 hours.

iv.   Reimbursable Costs

Plaintiff seeks $3,255.49 in expenses. (ECF Nos. 69 at 23; 71 at 22-23).

Both FEHA and the FHA permit awards of costs to a prevailing party. FEHA also explicitly permits a court to award "expert witness fees" to prevailing parties, other than against the state. Cal. Gov't Code § 12989.2; *cf. Olson v. Auto. Club of So. Cal.*, 42 Cal. 4th 1142, 1148 & n.2 (2008) (noting section 12989.2 permits award of expert witness fees). Plaintiff seeks $1,318.75 for expert witness fees for Colin Holbrook, Ph.D.

Most of those expenses are awardable. However, the Court notes that $545 of the cited expenses are related to service. (*See* ECF No. 71 at 23) ($200 and $345 for charges related to service.) It is not clear how much of those are related to Sarah or Meyer Komar. Therefore, the Court will charge Jeanette Komar only one-third of that amount: $181.67. Thus, as modified, the Court recommends awarding $2,892.16 in costs.

v.   Fees and Costs Awards Total

The Court recommends awarding Plaintiff the following attorneys' fees and costs:

| Fee Earner / Type | Reasonable Hourly Rate | Hours Reasonably Expended | Amount |
|---|---|---|---|
| Liza Cristol-Deman | $450 | 125.1 | $56,295 |
| Spencer Campbell | $110 | 8.5 | $935 |
| Ronnie Hodgkinson | $110 | 9.1 | $1,001 |
| Matthew Dahl | $110 | 1.9 | $209 |
| *Fee Subtotal* | | | *$58,440* |
| *Expenses Subtotal* | | | *$2,892.16* |
| **Total** | | | **$61,332.16** |

## IV.   CONCLUSION AND RECOMMENDATIONS

For the foregoing reasons, it is HEREBY RECOMMENDED that:

1) Plaintiff's motion for a default judgment (ECF No. 68) be GRANTED IN PART and DENIED IN PART;

2) Default judgment be entered in favor of Plaintiff against Jeanette Komar, for violations of the Fair Housing Act and the Fair Employment and Housing Act;

3) Denying Plaintiff's motion as to Sarah Komar and as to all other causes of action;

4) Plaintiff be awarded $33,812.67 in compensatory damages;

5) Plaintiff be awarded $61,332.16 in attorneys' fees and costs;

6) Issuing an injunction with the following terms:

   a. Jeanette Komar, her agents, employees, and all persons in concert or participation with any of them, is permanently enjoined from discriminating in the rental of dwellings based on any of the characteristics protected by the Fair Housing Act, and the Fair Employment and Housing Act, including the following:[8]

      i. Refusing to rent or sell a dwelling, refusing or failing to provide or offer information about a dwelling, or otherwise making unavailable or denying a dwelling to any person because of race, color, religion,

---

[8] The language in this paragraph and the sub-paragraphs below are copied nearly verbatim from the injunction issued by a court in this district in *Snow*, 2007 WL 91148, at *3-4.

gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law.;

ii. Discouraging or encouraging prospective tenants from obtaining information about, viewing, applying to rent, or renting any dwelling, on the basis or race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law;

iii. Discriminating against any person in the terms, conditions or privileges of rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law;

iv. Misrepresenting the availability of apartments for rent on the basis or race, color, national origin, sex, handicap, familial status or religion, or providing different information about the availability of apartments on the basis of race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law;

v. Withholding information regarding the availability of apartments for rent on the basis of race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or other characteristics protected by law.;

vi. Taking any action tending to constructively or actually remove or assist in the removal of any tenant from a rental unit on the basis of race, color, religion, gender, sexual orientation, national origin, familial status, marital status, disability, ancestry, age, source of income or

other characteristics protected by law, including but not limited to
refusing to accept tendered rent payments, issuing three-day notices,
filing unlawful detainer actions, or initiating any other type of legal or
administrative proceeding for alleged non-payment of rent on the basis
of race, color, religion, gender, sexual orientation, national origin,
familial status, marital status, disability, ancestry, age, source of
income or other characteristics protected by law;

vii.   Making, printing, publishing, or causing to be made, printed, or
published any notice, statement or advertisement with respect to the
rental of a dwelling that indicates any preference, limitation or
discrimination on the basis of race, color, religion, gender, sexual
orientation, national origin, familial status, marital status, disability,
ancestry, age, source of income or other characteristics protected by
law;

viii.   Steering persons seeking housing to particular units on the basis of
race, color, religion, gender, sexual orientation, national origin, familial
status, marital status, disability, ancestry, age, source of income or
other characteristics protected by law;

ix.   Inquiring into any prospective tenant's race, color, religion, gender,
sexual orientation, national origin, familial status, marital status,
disability, ancestry, age, source of income or other characteristics
protected by law; and

x.   Employing overly restrictive occupancy limits that have a disparate
impact on families with children;

b.   For a period of five years, or if sooner, until Jeanette Komar sells all of her
rental properties:

i.   Jeanette Komar and all agents who have contact with rental applicants
or tenants are required to attend yearly training regarding the fair

housing laws with Project Sentinel or another HUD-approved agency;

ii. Jeanette Komar must provide a copy of the DFEH pamphlet entitled "Fair Housing" (DFEH- H03B) to all current tenants and to all applicants;

iii. Jeanette Komar must offer alternative forms of communication for rental inquiries besides phone; for example, Jeanette Komar must also include an email address, rental agent location, or an open-house date, or provide at least one method besides a phone number for prospective tenants to inquire about or apply for vacancies.

iv. In all ads, website listings, or signs regarding rental vacancies, Jeanette Komar must use the fair housing logo or tagline, "Equal Opportunity Housing Provider," or similar words; and

v. Jeanette Komar must maintain all records of rental inquiries and rental applications, tenant records, and move-out records, and to make such records available to Project Sentinel upon Project Sentinel's request after receiving an allegation of discrimination; and

7) Plaintiff be ordered to show cause why this action should not be dismissed as to Sarah Komar, in writing, within thirty days of the order adopting these findings and recommendations.

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

\\\

\\\

\\\

\\\

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **April 12, 2021**                          /s/ *Erica P. Grosjean*

                                                    UNITED STATES MAGISTRATE JUDGE

42